## WHITAKER v. THE STATE.

1. The court did not err in excluding testimony to the effect that one Allen, jointly indicted with the defendant, came to the house of witness within twenty-five or thirty minutes after the killing, and requested that he be carried home; that Allen commenced to tell about the killing of the decedent, and said that he "shot him down, and after he fell we poured it into him again."

(a) The evidence was not admissible as a confession or admission made by Allen. *Lyon* v. *State*, 22 *Ga.* 399; *West* v. *State*, 155 *Ga.* 482 (117 S. E. 380).

(b) Nor was it admissible as a part of the res gestæ. It is in form and substance a narrative of what took place, and is not a declaration accompanying the act or so nearly connected therewith in time as to be free from all suspicion of device or afterthought. *Sullivan* v. *State*, 101 *Ga.* 800 (29 S. E. 16).

2. The court charged the jury as follows: "And he enters into the trial of this case with the presumption of innocence in his favor, and that presumption of innocence remains with the defendant throughout the entire trial, in the nature of evidence as a shield and a protection until the State convinces your minds by the evidence in the case, beyond a reasonable doubt, of the guilt of the defendant. That is, under the laws of the State of Georgia, where a defendant files a plea to the bill of indictment of not guilty, it puts in issue every material allegation contained therein; and it then devolves upon the State to satisfy the minds of the jury by the evidence in the case, by the circumstances developed in the trial of this case, to a reasonable and moral certainty and beyond a reasonable doubt, of the guilt of the defendant, before you would be authorized to convict him." Plaintiff in error excepts to this charge upon the ground that the court "did not go further and inform the jury that the burden was on the State to show the defendant's guilt beyond a reasonable doubt, and that this burden remained upon the State until it showed the guilt of the defendant." The charge as given affords the movant no ground of complaint. That the court did not charge in this connection that the burden was on the State to show the defendant's guilt beyond a reasonable doubt, and that this burden remained upon the State until the guilt of the defendant was proved, affords the plaintiff in error no ground of complaint, especially as it is not alleged that the court did not in other portions of the charge instruct the jury, literally or in substance, that the burden was upon the State to prove the defendant's guilt beyond a reasonable doubt. Moreover, in the very language here complained of it would seem that the court, in substance at least, instructed the jury that the burden was upon the State to prove beyond a reasonable doubt the allegations of the defendant's guilt, though he did not use the word "burden" or "burden of proof."

3. The court did not err in charging the jury upon the subject of malice, and in giving the correct definition of malice. The evidence authorized the charge upon the subject.

4. Certain evidence had been offered and rejected; and it was not error, in the charge, to instruct the jury that it would not be proper for that

body to consider testimony that had been excluded by the court from the consideration of the jury.

5. Error is assigned upon portions of the court's charge relating to a conspiracy between the accused and other parties. The court did not err in charging upon this subject, although conspiracy was not charged in the indictment. Nor is the exception to those portions of the charge well taken which assigns error on the ground that there was no evidence authorizing the same. An examination of the record shows that there was some evidence from which the jury would be authorized to find the existence of a conspiracy between the accused and other parties to commit the crime charged in the indictment.

6. There was evidence in the case, as shown by the record, from which the jury would have been authorized to find that the defendant was guilty, not of murder, but of voluntary manslaughter; and the court should have charged upon that subject. The failure to do so was error.

7. The law of justifiable homicide was not involved in this case, either under the evidence for the State or the accused, or under the statement of the defendant; and the assignment of error upon the court's failure to charge upon that subject is without merit.

No. 4395. FEBRUARY 19, 1925.

Murder. Before Judge Park. Putnam superior court. May 19, 1924.

R. C. Jenkins and W. O. Cooper Jr., for plaintiff in error.

George M. Napier, attorney-general, Doyle Campbell, solicitor-general, T. R. Gress, assistant attorney-general, and Meriwether F. Adams, contra.

BECK, P. J. R. S. Whitaker was tried under an indictment charging him and one Allen with the offense of murder, it being alleged that the two defendants unlawfully and with malice shot and killed one O. C. Harwood. The jury trying the case returned a verdict of guilty, with a recommendation. The defendant made a motion for a new trial, which was overruled, and he excepted.

1-4. The rulings made in headnotes one to four, inclusive, require no elaboration.

5. Several grounds of the motion for new trial contain assignments of error upon portions of the court's charge relating to a conspiracy between the accused and other parties, some of whom are not named in the indictment, and it is insisted that all of those portions of the charge based upon the theory that there was a conspiracy or common felonious intent upon the part of the accused and other parties to kill Harwood, the named decedent, were error. In some of the exceptions to these portions of the charge it is urged

that the charges given were error, because, in the first place, conspiracy is not charged in the indictment, and, in the second place, that there is no evidence of a conspiracy. The first ground of objection to the portions of the charge referred to is obviously without merit. *Dixon* v. *State,* 116 *Ga.* 186 (42 S. E. 357). Where two or more persons, in pursuance of a common intent to commit murder, carry out and execute the plan, though but one of them be indicted, on the trial it may be shown that the person actually indicted was guilty of murder in the second degree, if he was there aiding and abetting the crime, though the criminal act was actually perpetrated by one of his accomplices. If there be proof offered for the consideration of the jury that there was a conspiracy, the acts of the conspirators or accomplices of the accused, who were present participating in the commission of the crime, may be proved; and it is not necessary to charge, in the indictment, that the defendant was guilty of murder in the second degree, in order to offer proof that he was guilty of that offense. The existence of a conspiracy may be shown as well by circumstances as by direct evidence, as has been frequently ruled. While the evidence tending to show conspiracy in this case is not strong, under all the evidence and circumstances proved it was proper to submit that theory of the State's case to the jury and give to the jury instructions appropriate to the contention that if the decedent was not actually slain by the defendant on trial, he was slain by one of the accomplices or conspirators, and that the accused was present aiding and abetting. Whether such a conspiracy actually existed or not, and whether the defendant was participating in a common intent to commit the crime with which he is charged, under the evidence in this case became questions for the jury. Counsel for the plaintiff in error strongly urges that there was no evidence to authorize the charge upon that subject. We here append a brief statement of the State's evidence upon this subject.

Ed. Harwood, a brother of the decedent, testified for the State: Whitaker and Allen and one other came to the sawmill on the day of the killing; they had been drinking to some extent. Allen said they had some whisky stolen and were trying to locate it, and claimed that the decedent and his brother and some colored boys got it. They stayed at the mill until quitting time, about seven o'clock, and left the mill in the company of the mill employees.

After going with them for a hundred yards or so, Whitaker said he would go by another road, and left them. After proceeding for about a half hour they met an automobile, and out of it stepped Whitaker, the defendant, and one Heath, and there was another in the car. Heath and the decedent began talking, but witness did not know there was any trouble between them. Whitaker came near witness. Allen was on the other side of the car, to the rear of it. The shooting began from the direction of Allen, but witness did not know whether or not that shot struck his brother. Witness saw Whitaker fire a pistol, being within five or six feet of him, and it looked to witness that defendant was shooting towards the decedent. There were other shots fired besides those fired by Whitaker. Decedent's back was not turned towards the defendant, so far as witness saw, but decedent was shot in the back, and lived less than an hour afterwards. Witness didn't actually see any one but the defendant shoot. Witness's brother, the decedent, said before he died that Heath shot him.

Emanuel Banks, a witness for the State, testified that when he and the other sawmill employees quit work for the day they went by a shack, but that Whitaker went ahead, and later they met him and Heath in an automobile. They both got out of the automobile, and Heath asked what was the matter, and Allen said, "We want to know who stole the whisky, Mr. Harwood or them boys." Heath pulled off his coat and asked the decedent if he wanted to fight, and the decedent said nothing. Then the shooting took place. Witness did not know who shot the first, or second, or third time.

We think, when all of these facts are considered together, the question of the existence or non-existence of a conspiracy was made, and it was exclusively within the province of the jury to decide it. It is unnecessary for us to argue the question made by the evidence, but one or two features of it may well be pointed out to show that the judge was authorized to charge on the subject of a conspiracy. In the first place, the accused, with two other persons, went to the place where the decedent and certain employees of the mill were at work. The deceased was there and his brother and several employees. The defendant, after starting back with the men who were at the mill, separated from them and said he would go back by another road. He did go off by another road, but he returned in an automobile with a companion sitting by him on

the front seat, and, according to one witness, one or more others were in the car. Intoxicating liquors had been imbibed, and the jury were authorized to find that the accused and those who the State insists were his accomplices were in a frame of mind to commit crime upon a very slight provocation. Besides, the number of pistols in the party was a fact which the jury were authorized to consider in connection with all the other proved facts, in passing upon the question of a common intent to commit the act in question,—that is, the felonious killing of a human being. We express no opinion as to the strength or weight of this evidence; it would be improper for us to do so. We merely hold that it is sufficient to authorize the court to submit the question of a conspiracy to the jury, and this the court did.

6. Exception is taken, in one of the grounds of the motion for new trial, to the failure of the court to charge upon the subject of voluntary manslaughter. We express no opinion as to the strength or weight of the evidence in the record which introduces the element of voluntary manslaughter into the case. We merely rule that there was some evidence authorizing the jury to consider whether the defendant was guilty of the offense of voluntary manslaughter. Where there is any evidence at all tending to show that the homicide was not murder but voluntary manslaughter, the law upon that subject should be given, and a failure to give it is error. We have already set out above the substance of the evidence tending to show the circumstances under which the deceased and his companions came in contact with the accused and his companions. The theory of the State was that the accused, or the accused and his companions, or one of those with whom he was acting in concert, without justification and without provocation that would justify an attack with a deadly weapon or palliate the deadly assault, commenced firing upon the deceased. But one of the witnesses for the State, Emanuel Banks, testified in part as follows: "When I was down there at the sawmill I didn't see Mr. Allen with a gun. Mr. Buchanan had a 20-gauge pump shotgun. Mr. O. C. Harwood [the decedent] had an automatic gun. Mr. Ed. Harwood didn't have any. I didn't see Mr. Ed. Harwood shoot any that night. Yes, sir, they talked awhile at the sawmill; all three of them talked to Mr. Harwood. Mr. Harwood came up the road, and Mr. Ed. and Mr. Allen and Mr. Buchanan. No, sir.

they were not fighting nor quarreling. When we met the automobile Mr. Whitaker was on the front seat, and Mr. Heath was driving. Mr. Whitaker got out first on the right-hand side of the car, and he went on the left towards the others—Mr. Harwood was around there, and Cape Morgan—and Mr. Heath got out then. And Mr. Heath asked what was the matter, and Mr. Allen said, 'We want to know who stole the whisky, Mr. Harwood or them boys.' And Mr. Heath pulled off his coat and asked him, Mr. Otho [the deceased], did he want to fight, and Mr. Otho never said anything else to him; then the shooting took place. I don't know who shot first, second, or third—it was all done at the same time. I didn't see Mr. Allen shoot. Mr. Buchanan shot. I don't know whom he hit. When it started I was between Mr. O. C. Harwood and the car. The shotgun and this man's pistol was the first ones that shot; it was all done at the same time. Cape Morgan was behind Mr. Allen, and he was standing facing the side of the car. I have been working for Mr. Harwood going on two years. I am still working with him." Another witness, a brother of the deceased, testified for the State that the deceased had a shotgun, and that it was shot one time, though he didn't see his brother shoot.

The evidence in this record does not very clearly set forth the circumstances attending the homicide. The evidence is brief, and leaves the exact status and relation of the parties in doubt. But where there is enough evidence to authorize the jury to find that a homicide took place without any mixture of deliberation whatever, but upon a sudden heat of passion, there being circumstances adequate to the provocation of such passion, a charge upon the subject of voluntary manslaughter should be given. For if, upon a sudden quarrel, the parties fight upon the spot and one of them is killed, and there is evidence to show that the killing was under the circumstances last indicated, then a charge upon the subject of voluntary manslaughter should be given.

7. The law of justifiable homicide was not involved in this case, either under the evidence for the State or the accused, or under the statement of the defendant; and the assignment of error upon the court's failure to charge upon that subject is without merit.

*Judgment reversed. All the Justices concur, except Hill and Hines, JJ., dissenting.*

RUSSELL, C. J. I concur in the judgment of reversal upon the ground that the law of voluntary manslaughter should have been given in charge; but I am also of the opinion that the slight circumstances introduced in proof were wholly insufficient to raise any inference of any previous conference or conspiracy between the several persons who engaged in firing upon the deceased. In my opinion, therefore, it was error to instruct the jury upon the subject of conspiracy at all.

HILL and HINES, JJ., dissent on the ground that voluntary manslaughter is not involved under the evidence, and that the judgment of the trial court should be affirmed.